# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                 Case No. 05-CR-200

CHRISTOPHER M. MOSES,

        Defendant.

## RECOMMENDATION ON PRE-TRIAL MOTIONS

On August 2, 2005, a grand jury sitting in the Eastern District of Wisconsin returned a seven-count indictment against the defendant, Christopher M. Moses ("Moses"). On November 1, 2005, the grand jury returned a superceding indictment against Moses. The superceding indictment is identical to the original indictment but for a minor change in Count Two.

Count One of the superceding indictment charges Moses with possessing six firearms after having been previously convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 942(a)(2). (Superceding Indictment at 1.) Count Two charges Moses with possessing body armor, to wit, "two 'small long,' front, body armor ballistic panels, and two 'small long,' back, body armor ballistic panels," after having been previously convicted of a violent crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 931(a)(1) and 924(a)(7). (Superceding Indictment at 2.) Counts Three through Seven all charge Moses with possessing an unregistered destructive device, in violation of 26 U.S.C. §§ 5841, 5845, 5861(d), and 5871. In each of Counts Three through Seven the destructive device

Moses allegedly possessed is a "gold top 40mm cartridge marked 'HEDP.'" (Superceding Indictment at 3-7.)

Moses has filed three pre-trial motions. The first is a motion to dismiss the indictment. The second is a motion to suppress evidence allegedly seized in violation of the Fourth Amendment, and the third is a motion to compel the government to grant immunity to a witness Moses wishes to call in his defense. Moses' motions are now fully briefed and are ready for resolution. For the reasons that follow, it will be recommended that Moses' motion to dismiss the indictment be denied. It will also be recommended that Moses' motion to compel the government to grant immunity and motion to suppress evidence be denied.

## I. MOTION TO DISMISS THE INDICTMENT

Moses' motion to dismiss the indictment is premised on three separate arguments. First, Moses argues that Count One of the indictment should be dismissed because the provisions under which he has been charged, specifically, 18 U.S.C. § 921(a)(20)(A), creates an "impermissible distinction between all felons convicted of a 'crime punishable by imprisonment for a term exceeding one year' while exempting those felons convicted of 'any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices,'" and thus violates Moses' right to equal protection conferred by the Due Process Clause of the Fifth Amendment to the United States Constitution. (Mot. to Dismiss at 2.) Second, Moses argues that Count Two should be dismissed because "his previous conviction for Fleeing/Eluding an Officer in the state of Wisconsin is not a 'violent crime,' as that term is defined in 18 U.S.C. § 16." (Mot. to Dismiss at 2.) Finally, Moses argues that Counts Three through Seven should be dismissed because they "fractionate a single offense into multiple charges in

2

violation of his rights under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution." (Mot. to Dismiss at 2.)

## A. Count One

The statute that Count One charges Moses with violating, 18 U.S.C. § 922(g), provides in pertinent part that "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm." However, 18 U.S.C. § 921(a), which provides the definitions pertinent to § 922, provides that "[t]he term 'crime punishable by imprisonment for a term exceeding one year' does not include . . . any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." 18 U.S.C. § 921(a)(20). Moses argues that the exemption of only "business" felonies from the purview of § 922 constitutes a violation of the equal protection rights conferred by the Due Process Clause of the Fifth Amendment.

As both Moses and the government recognize in their briefs, the Seventh Circuit has already decided the equal protection issue raised by Moses. In *United States v. Jester*, 139 F.3d 1168 (7th Cir. 1998), the court considered an argument identical to the one raised by Moses. The *Jester* court determined that the right to possess a firearm is not a fundamental right, and felons are not a protected class, and thus the court examined § 922 under "rational basis" review. *Id.* at 1171. The court then found that there was indeed a rational basis for exempting felons convicted of the offenses set forth in § 921(a)(20) from the prohibitions contained in § 922. *Id.*

Recognizing that *Jester* and another Seventh Circuit case, *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999), do not support his position, Moses argues that those cases "are thrown

Case 2:05-cr-00200-LA   Filed 12/16/05   Page 3 of 33   Document 35

into serious question by three more recent cases that vitiate their holdings and methods of analysis."
(Def.'s Br. at 3.)  In *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), the Fifth Circuit Court
of Appeals, after extensive analysis, concluded that the Second Amendment protects individuals in
their right to keep and bear arms regardless of whether they are members of a militia.  *Id*. at 260.
That holding is contrary to the Seventh Circuit's holding in *Gillespie*.  The *Gillespie* court held that
"the Second Amendment establishes no right to possess a firearm apart from the role possession of
the gun might play in maintaining a state militia."  *Gillespie,* 185 F.3d at 710.

Furthermore, Moses points to two Supreme Court cases, *Crawford v. Washington*, 541 U.S.
36 (2004), and *Blakely v. Washington*, 524 U.S. 296 (2004).  Neither *Crawford* nor *Blakely* deal with
§ 922, or even the Second Amendment, but Moses cites to them because of the methodology of
constitutional analysis that the majority opinions in those cases employ.  Moses argues that *Crawford*
and *Blakely* signal a shift in methodology for interpreting the Constitution, which is based on
historical analysis.  Moses contends that the Fifth Circuit employed a rigorous historical methodology
in *Emerson*, and in doing so, arrived at the conclusion that the Second Amendment protects
individual rights, rather than a collective right.  Therefore, Moses maintains, because the *Emerson*
court's methodology is in keeping with the methodology of *Crawford* and *Blakely*, the Seventh
Circuit cases which arrived at a different conclusion, i.e., *Jester* and *Gillespie*, are called into
question.

All of the preceding leads up to Moses' ultimate argument.  Moses contends, based on
*Emerson*, that the Second Amendment does indeed confer a fundamental right to bear arms on
individuals.  Therefore, in assessing § 922, which impinges on that right, this court should employ
the "strict scrutiny" standard rather than the "rational basis" standard.  Moses argues that the

4

exemption of certain "business crimes" from the prohibitions of § 922, but not other felonies, cannot survive strict scrutiny.

Moses has identified a split amongst the Circuit Courts of Appeals regarding the proper interpretation of the Second Amendment. However, this court is bound by the precedent of the Seventh Circuit Court of Appeals. The Seventh Circuit has held that the right to possess a firearm is not a fundamental right, *Jester*, 139 F.3d at 1171, and furthermore, that the exemption of the crimes listed in § 921(a)(20) from the prohibitions of § 922(g) passes constitutional muster. *Id*. This court is bound by *Jester* regardless of the Fifth Circuit's decision in *Emerson*.[1]

I also do not agree with Moses that the Supreme Court's holdings in *Crawford* and *Blakely* "vitiate" the precedential value of *Jester*. The majority opinions in those cases do indeed employ historical analysis in interpreting the Constitution, but that does not mean that the Supreme Court would ultimately find as the Fifth Circuit did on the Second Amendment question. Even if the Supreme Court were to analyze the question using a similar methodology as the *Emerson* court, it might come to a different conclusion. And even more importantly, this court cannot disregard controlling precedent based on speculation as to what the Supreme Court might do if a particular question were to come before it.

In short, *Jester* is binding precedent. The *Jester* court held that the exemption of the crimes listed in § 921(a)(20) from the prohibitions of § 922(g) passes constitutional muster. *Jester*, 139 F.3d at 1171. It will therefore be recommended that Moses' motion to dismiss Count One be denied.

_____

[1] The Seventh Circuit has recognized that its holding in *Gillespie* is contrary to the Fifth Circuit's holding in *Emerson*, but declined to reconsider the Second Amendment question. *United States v. Price*, 328 F.3d 958, 961 (7th Cir. 2003).

5

**B. Count Two**

Count Two charges Moses with violating 18 U.S.C. § 931, which provides in pertinent part that, "it shall be unlawful for a person to purchase, own, or possess body armor, if that person has been convicted of a felony that is . . . a crime of violence (as defined in section 16)." Title 18 U.S.C. § 16 provides that:

> The term "crime of violence" means--
> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The indictment alleges that "Christopher Moses has previously been convicted of the felony offense of Fleeing/Eluding an Officer, in case number 2001CF00282, in Fond du Lac County." (Superceding Indictment at 2.) The law which Moses was convicted of violating is Wis. Stat. § 346.04(3), which provides:

> No operator of a vehicle, after having received a visual or audible signal from a traffic officer, or marked police vehicle, shall knowingly flee or attempt to elude any traffic officer by willful or wanton disregard of such signal so as to interfere with or endanger the operation of the police vehicle, or the traffic officer or other vehicles or pedestrians, nor shall the operator increase the speed of the operator's vehicle or extinguish the lights of the vehicle in an attempt to elude or flee.

Moses argues that Count Two should be dismissed because Fleeing/Eluding an Officer is not a "crime of violence" as that term is defined by § 16. When determining whether an offense is a "crime of violence" under § 16, the court should "look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to [the defendant's] crime." *Leocal v. Ashcroft*, 125 S.Ct. 377, 381 (2004). Physical force is not an element of Wis. Stat. § 346.04(3), and § 16(a) therefore does not apply. As a result, this court must determine whether the offense, as set

6

forth by §346.04(3), "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16(b).

In *Leocal*, the Supreme Court made a critical distinction between a crime that involves a substantial risk that injury will result, and a crime that involves a "substantial risk that physical force . . . may be used." *Leocal*, 125 S.Ct. at 383 & n.7. The court noted that § 16, unlike other similar statutes, looks not to the risk that injury will result, but to the risk that force will be used. *Id.* Therefore, burglary would qualify as a "crime of violence" under § 16 not because injury is likely (although it may be), but because it is likely that the perpetrator will use force in completing the crime, i.e., the perpetrator will complete the burglary by striking the victim or wrenching something from the victim. *See id.* at 383. The focus of inquiry in the matter at hand, then, is not whether Fleeing/Eluding an Officer involves a substantial risk of injury, but whether it involves a substantial risk that the perpetrator will use force in the course of fleeing. In other words, it is not enough that it is likely that a person fleeing from the police in a vehicle will inadvertently strike a pedestrian with the vehicle, there must be a substantial risk that the perpetrator will intentionally (or with some other heightened *mens rea*) use force in the course of fleeing. *See id.*

The Seventh Circuit has considered whether escape or eluding offenses are crimes of violence on at least two recent occasions, *United States v. Bryant*, 310 F.3d 550 (7th Cir. 2002) and *United States v. Howze*, 343 F.3d 919 (7th Cir. 2003). However, in both *Bryant* and *Howze*, the court considered provisions which defined crimes of violence differently than § 16. In both cases the question was whether a crime "involves conduct that presents a serious potential risk of physical injury to another." *Bryant*, 310 F.3d at 553; *Howze*, 343 F.3d at 920. As a result, the holdings in those cases are not directly on point. The court's reasoning in those cases, however, is instructive.

7

In *Bryant*, the court considered the crime of escape (the defendant had failed to return to a halfway house) and found that "[e]very escape scenario is a powder keg, which may or may not explode into violence and result in physical injury to someone at any given time, but which always has the serious potential to do so." *Bryant*, 310 F.3d at 553 (quoting *United States v. Gosling*, 39 F.3d 1140, 1142 (10th Cir.1994)). In *Howze*, the court considered the same statute at issue here, Wis. Stat. § 346.04(3), and compared the crime of Fleeing/Eluding an Officer to the crime of escape that was the focus of *Bryant*. *Howze*, 343 F.3d at 921-22.

I find the reasoning of the court in *Bryant* to be instructive here. When a person commits the crime of escape, there is a danger that the person will commit an act of violence when an attempt is made to recapture him or her. Stated another way, there is a risk that the person will use violence to perpetuate the escape. Likewise, when a person eludes or flees from the police in a vehicle, "by willful or wanton disregard of [the officer's] signal so as to interfere with or endanger the operation of the police vehicle, or the traffic officer or other vehicles or pedestrians" or "increase[s] the speed of the operator's vehicle or extinguish[es] the lights of the vehicle in an attempt to elude or flee," there is also a substantial danger that the person will use violence or force when the police attempt to apprehend him or her. In my opinion, Fleeing/Eluding an Officer, as that offense is defined by Wis. Stat. § 346.04(3), involves a "substantial risk" that the perpetrator will use "physical force against the person or property of another" in the course of fleeing.

I am mindful that the Ninth Circuit Court of Appeals came to a different conclusion when analyzing a similar statute. *See Penuliar v. Ashcroft*, 395 F.3d 1037 (9th Cir. 2005). However, in *Penuliar* the court was concerned with a provision of the California Vehicle Code which makes it possible for conduct which is only negligent, and not intentional, to violate the California fleeing

8

statute. *Id.* at 1041-42. Section 346.04(3), on the other hand, targets only those that "knowingly flee or attempt to elude any traffic officer." The heightened *mens rea* required by *Leocal* is therefore present in the Wisconsin statute. Furthermore, my reading of *Leocal* leads me to the conclusion that under § 16(b), the heightened *mens rea* requirement should be applied to the physical force that there is a substantial risk might be used. That is to say, there must be a substantial risk that the perpetrator will intentionally[2] use force to complete or further his or her attempt to flee. As stated above, I am satisfied that there is a substantial risk that a person eluding or fleeing from the police will intentionally use force in the course of such fleeing.

For all of the aforementioned reasons, it will be recommended that Moses' motion to dismiss Count Two be denied.

## C. Counts Three through Seven

Counts Three through Seven are all identical, and each charges Moses with knowingly possessing an unregistered destructive device, to wit, a gold top 40mm cartridge marked "HEDP." Moses argues that charging the possession of each cartridge separately violates his rights under the Double Jeopardy Clause of the Fifth Amendment. One of the protections provided by the Double Jeopardy Clause is that it protects against multiple punishments for the same offense. *Ohio v. Johnson*, 467 U.S. 493, 498 (1984). The protection against cumulative punishments "is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature. Because the substantive power to prescribe crimes and determine punishments is vested with the

---

[2] I am using the *mens rea* of intentional conduct for simplicity. In *Leocal* the court did not specifically require intentional conduct, but a "higher *mens rea* than . . . merely accidental or negligent conduct." *Leocal*, 125 S.Ct. at 383.

9

legislature, the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent." *Id*. (citation omitted).

Title 26 U.S.C. § 5841 provides for the maintenance of "a central registry of all firearms in the United States which are not in the possession or under the control of the United States." The registry is called the National Firearms Registration and Transfer Record. Title 26 U.S.C. § 5861 provides that, "It shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." Furthermore, the term "firearm" is defined as including not only guns but also "destructive device[s]." 26 U.S.C. § 5845(a)(8). And "destructive device" is in turn defined as:

> (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled.

26 U.S.C. § 5845(f).

While this court is not aware of any case in which the Seventh Circuit considered whether the possession of multiple unregistered firearms may be prosecuted as separate violations of § 5861(d), several other circuits have considered the issue and answered in the affirmative. *United States v. Nichols*, 731 F.2d 545, 546 (8th Cir. 1984) ("Under section 5861(d) each firearm is a unit of prosecution even if the defendant possessed several firearms at the same time."); *United States*

10

*v. Alverson*, 666 F.2d 341, 347 (9th Cir. 1982); *United States v. Tarrant*, 460 F.2d 701, 704 (5th Cir. 1972); *Sanders v. United States*, 441 F.2d 412, 414 (10th Cir. 1971).

Indeed, the defendant has not cited to a single case which holds otherwise. Instead, Moses points to Seventh Circuit case law holding that in prosecutions under 18 U.S.C. § 922(g), the proper procedure is to charge all the weapons possessed at the same time and in that same place in a single count. *United States v. Conley,* 291 F.3d 464, 470 (7th Cir. 2002). However, the reason why the possession of multiple firearms must normally be charged in one count under 18 U.S.C. § 922(g) is that the courts have been unable to clearly determine Congress' intended unit of prosecution under that section. *United States v. Buchmeier*, 255 F.3d 415, 422 (7th Cir. 2001). The courts have not had the same difficulty in determining Congress' intent under § 5861(d). *Sanders*, 441 F.2d at 414 ("It would appear to us that the legislative intent in this instance is quite clear and that 'each firearm' constitutes a separate unit for the purposes of criminal prosecution."); *Tarrant*, 460 F.2d at 704 ("[A]n examination of the statutory scheme convinces us that Congress intended the possession of five firearms to constitute five separate offenses.").

Moses argues that *Tarrant* (and thus the other cases which rely on *Tarrant*) is inapplicable because that case dealt with taxation issues and therefore offers little help in analyzing the issues presented in this criminal prosecution. (Def.'s Reply at 4-5.) Moses' contention is incorrect. Like the case at hand, *Tarrant* was a criminal prosecution under § 5861(d). The *Tarrant* court only discussed taxation because it found the overall taxation scheme of the statute to be informative on the question of what unit of prosecution Congress intended. *Tarrant*, 460 F.2d at 704.

In the end, although for somewhat different reasons, every circuit court of appeals that has dealt with the question has held that Congress intended that the possession of multiple unregistered

Case 2:05-cr-00200-LA   Filed 12/16/05   Page 11 of 33   Document 35

firearms could be charged as multiple violations of § 5861(d).[3]  It will therefore be recommended that Moses' motion to dismiss Counts Three through Seven of the indictment or, in the alternative, to have them consolidated into a single count be denied.

## II. MOTIONS TO SUPPRESS EVIDENCE AND COMPEL GRANT OF IMMUNITY

On October 18 and 20, 2005, this court conducted an evidentiary hearing on Moses' motion to suppress evidence seized pursuant to a search of Moses' house located at 517 Forrest Avenue, Fond du Lac, Wisconsin.  The search was conducted by law enforcement officers on April 19, 2005. At the outset of the hearing, Moses' counsel informed the court that a witness whom he had subpoenaed to testify, Christine Stoffel ("Stoffel"), was in the courtroom, but would be invoking her Fifth Amendment rights and would not testify as to the circumstances surrounding the search. Indeed, Stoffel, by her counsel, represented in open court that if she were called to the witness stand she would invoke her Fifth Amendment rights and refuse to testify.  (Tr. at 9.)  Moses' attorney represented that he had previously requested that the government grant Stoffel immunity for her testimony, but the government refused.  (Tr. at 5.)  Moses therefore filed his motion to compel the government to grant Stoffel immunity.

### A.  Motion to Compel Grant of Immunity

There is clear precedent in this circuit that "a federal court cannot order the government to immunize a defense witness."  *United States v. Burke*, 425 F.3d 400, 411 (7th Cir. 2005).  However, "courts can dismiss an indictment where the prosecutor's refusal to grant immunity has violated the

---

[3]  It appears that there may be some variance amongst the circuits on the question of when consecutive sentences may be imposed.  *See Nichols*, 731 F.2d at 547; *Alverson*, 666 F.2d at 346-47.  That question, however, is not presently before the court.

12

defendant's right to due process." *Id*. The government cited these governing legal principals in its response to Moses' motion. In his reply, Moses states that he "will take the Government up on its invitation and convert his Motion to Compel Immunity Request into a Motion to Dismiss." (Def.'s Reply at 2.) This court too will treat Moses' motion as a motion to dismiss the indictment.

A federal prosecutor has considerable discretion in granting immunity to witnesses. *United States v. Hooks*, 848 F.2d 785, 798 (7th Cir. 1988). However, "[t]he prosecutor's broad discretion to refuse immunity is limited by the defendant's due process rights. A defendant's due process rights are violated when the prosecutor abuses his authority to immunize witnesses with the intention of distorting the fact-finding process." *Burke*, 425 F.3d at 411. An example of such an abuse is when a potential witness is not simply warned about the consequences of perjury, but is intimidated by threats of a perjury charge to the point of refusing to testify. *See Hooks*, 848 F.2d at 799-800.

It is incumbent on the defendant to make a "substantial evidentiary showing" that the prosecutor is abusing his discretion by not granting immunity. *Burke*, 425 F.3d at 411. Furthermore, the prosecutor's discretion to decline immunity to a witness is particularly present when the witness could be charged with perjury or other crimes. *Id*; *see also Hooks*, 848 F.2d at 799 (treating favorably Second Circuit precedent summarily rejecting claims for defense witness immunity whenever the witness for whom immunity is sought is an actual or potential target of prosecution). In short, the court should dismiss an indictment based on the government's refusal to immunize a defense witness only in rare circumstances. *See United States v. Herrera-Medina*, 853 F.2d 564, 568 (7th Cir. 1988) (stating hypothetically that a case might be dismissed if the government had no intention of prosecuting a potential defense witness, threatened the witness with prosecution in order

to deprive the defendant of the witness's testimony, at the same time refused to grant immunity, and the witness's testimony was important to the defense).

In the case at hand, Moses has not made a showing that the prosecutor is abusing his discretion by refusing to grant Stoffel immunity. There are no allegations that the government has threatened or intimidated Stoffel in any way. Moreover, while the court is not aware of any federal charges against Stoffel, the testimony at the evidentiary hearing makes clear that Stoffel is at least a *potential* target for prosecution. Investigator Ledger testified that he found a "sandwich baggy" containing 48 Vicodin pills in Stoffel's purse and baggy of marijuana in the pocket of a pair of woman's jeans at the 517 Forrest Avenue address where Stoffel was living. (Tr. at 43, 51.)

Moses argues that the government's refusal to grant Stoffel immunity results in a distortion of the fact finding process. (Def.'s Reply at 2.) However, the basis for this claim appears to simply be that Moses expects that Stoffel will testify in a manner consistent with her pervious statement, i.e., in a manner favorable to Moses, and that she would be a credible witness. In the end, in order to establish that the prosecutor is abusing his discretion by refusing to grant a witness immunity, the defendant must do more than show that the witness whom he wishes to have testify might testify in a manner favorable to him. If that were all that is necessary, the prosecutor would have little discretion indeed to refuse grants of immunity. Because Moses has not made a substantial showing that the government is abusing its discretion in refusing to immunize Stoffel, it will be recommended that Moses' motion to compel a grant of immunity be denied.[4]

_____

[4] As discussed above, Moses' motion to compel a grant of immunity is in essence a motion to dismiss the indictment. This court will therefore issue a recommendation rather than an order on Moses' motion. *See* 28 U.S.C. § 636(b)(1).

14

## B.  Motion to Suppress Evidence

Moses argues that evidence seized from his residence at 517 Forrest Avenue, Fond du Lac, Wisconsin should be suppressed because its seizure was the result of an illegal search.  The guns, body armor, and explosive devices at issue were seized pursuant to a search warrant issued by Circuit Court Judge Seven W. Weinke.  However, Moses maintains that a previous illegal search resulted in the police obtaining the warrant, and that the evidence should therefore be suppressed as a fruit of the previous illegal search.  The government contends that the initial search was conducted upon the valid consent of Christine Stoffel, and was therefore was not illegal.

### 1.  Evidence Introduced at the Evidentiary Hearing

The following is a brief summary of the testimony offered at the evidentiary hearing conducted by the court on October 18 and 20, 2005.

### Investigator William Ledger

William Ledger testified that he is an investigator with the Lake Winnebago Area Metropolitan Enforcement Group drug unit and has been a law enforcement officer for approximately eleven years.  Investigator Ledger and his partner, Investigator Eric Muellenbach, received an anonymous tip that Christine Stoffel would possibly be in possession of crack cocaine, marijuana, and prescription medications.  (Tr. at 31-34.)  The tip also contained a description of the vehicle Stoffel was driving and the general vicinity of where she was living.  The investigators went to the area described, located a vehicle matching the description given, and ran the registration of that vehicle.  It came back to Stoffel.  The vehicle was in the driveway of 517 Forest Avenue, Fond du Lac, Wisconsin.  (Tr. at 33-34.)

After confirming that the vehicle was registered to Stoffel, the investigators pulled up in front of the residence and noticed Stoffel sitting on the front porch. Investigator Ledger recognized Stoffel because she was an employee of the Sheriff's department and he knew her from work. (Tr. at35-36.) The investigators approached Stoffel and told her that they were there to investigate the tip regarding her involvement in illegal drug activity. Stoffel denied having possession of illegal narcotics. (Tr. at 36-37.)

The investigators explained to Stoffel that when an anonymous tip comes in, they have to follow up. They then asked Stoffel for consent to search the property. Stoffel gave consent for her vehicle to be searched. Muellenbach searched the vehicle but did not find anything. At this point, Stoffel did not appear upset, stressed, or nervous. (Tr. at 37-39.)

Ledger asked Stoffel how long she had lived at 517 Forest Avenue, and Stoffel answered that she had lived there for a couple of months. Stoffel also indicated that she had belongings scattered throughout the house including in the kitchen, dining room, and the bedroom which she shared with the owner of the house, Christopher Moses. Stoffel also stated that she had a key to the residence. (Tr. at 39-41.) Ledger asked Stoffel if she had a purse or personal belongings that they could look through. Stoffel indicated that her purse was inside on the kitchen table. Stoffel started to walk up the steps to go inside, and while he was on the porch, Ledger asked if they could follow her inside. Stoffel said that they could go inside with her, and the investigators did go inside. (Tr. at 41-42.)

The investigators followed Stoffel through the dining room into the kitchen where Stoffel's purse was on the kitchen table. Ledger asked for consent to search the purse and Stoffel granted consent. (Tr. at 41-42.) Ledger testified that Stoffel was a little reluctant at this point. She said that she didn't want the investigators to search the whole house because she thought Moses would get

mad if she allowed them to do so. Nevertheless, she consented to a search of her personal belongings. Ledger searched Stoffel's purse and found a sandwich baggy containing roughly 48 Vicodin pills. Stoffel was only able to produce one Vicodin prescription bottle accounting for 15 pills. (Tr. at 43-46.)

Ledger asked Stoffel where else in the residence she had personal belongings or medication bottles and she answered that there might be some in the bedroom. Ledger asked for consent to search the bedroom and Stoffel granted consent to search her personal belongings there. (Tr. at 46, 48.) At this point Stoffel was still cooperative, but she did try unsuccessfully to reach Moses on the phone. Among other things in the bedroom, Ledger noticed a pair of woman's jeans hanging over a chair that had a small baggy of marijuana hanging out of the pocket. (Tr. at 48, 51.) Before Ledger saw the marijuana, Stoffel went to either make a phone call or answer the phone. Upon discovering the marijuana, Ledger went out of the bedroom, got Stoffel, and brought her back to the bedroom. Ledger asked Stoffel if the pants were hers. Stoffel responded that they were, but she didn't know whose marijuana it was. Also in the pants, Ledger located a veterans' ID card for prescription medication with Stoffel's picture and name on it. (Tr. at 51-53.)

After the discovery of the marijuana, they went back to the kitchen. Stoffel was able to contact Moses on the phone. The investigators spoke with Moses on the phone and Moses told them he did not want them to search any further. At this point Stoffel went along with Moses and also did not allow the investigators to search any further. (Tr. at 53-54.) The investigators then went into the dining room area and secured the residence, not allowing anybody other than investigators into the residence. Muellenbach took the marijuana, left the residence, drew up an affidavit, and obtained a search warrant. (Tr. at 54-56.)

17

Other law enforcement officers arrived on the scene and congregated in the dining room area of the house. One of the new arrivals, Agent Steve Lewis, did a search of the upstairs to ensure that nobody else was present in the residence. The officers waited in the front portion of the house for approximately two and one half hours for the search warrant to be obtained. While they were waiting, Moses arrived on the scene. Once the warrant was obtained, the officers searched the house and found the various guns, ammunition, two halves of a ballistic vest, and several 40 millimeter explosive devices. (Tr. at 56-61.)

On cross-examination, Ledger testified that he asked for permission to follow Stoffel into the house before actually doing so. Ledger also testified that he did not believe that two previous statements he had made (one in a report that he authored and one consisting of testimony in state court), which are ambiguous as to the chronology of the events, are inconsistent with his current testimony. (Tr. at 74.)

Ledger testified that there was a lot of "stuff" inside the house, including bags, crates, and boxes, some of which appeared to have been moved from someplace else, but never unpacked. The guns were found in various places in the bedroom. (Tr. at 76-77.)

Ledger asked Stoffel about any contact she had with several individuals suspected of illegal drug activity, but he did not record this in his report. (Tr. at 81-82.) Ledger had known Stoffel because they were both law enforcement officers. Stoffel was employed at the Sheriff's office as a correctional officer. Ledger and Muellenbach had also interacted with Stoffel socially, had been to her home, and were familiar with her dog. Moses introduced into evidence several pictures of Ledger and Muellenbach interacting socially with Stoffel. Ledger estimates that the pictures were taken several years ago. (Tr. at 79-80, 82-88.)

18

Ledger was alone in the bedroom when he discovered the marijuana. Stoffel had been there with him, but she left before he observed it. (Tr. at 93.) Once the search warrant was obtained, handguns, long guns, and ammunition for both were located in the bedroom. The grenade launcher rounds were found in the basement. Once the firearms were found, a criminal history was run on Moses. The investigators learned that Moses was a convicted felon, and therefore went outside where Moses was, and arrested him. The firearms were eventually inventoried and secured in Ledger's vehicle. (Tr. at 96-99.)

Ledger testified that he does not like it when police officers break the law, and that when the officer is a personal friend, it is even more disappointing. (Tr. at 100.) Ledger had reviewed the statement which Stoffel made previous to his testimony. He discussed the statement with Muellenbach and made some notes in the margin of the statement. With regard to Stoffel's statement, Ledger thought that "most of it was lies." (Tr. at 102-104.)

With regard to the notes Ledger wrote in the margins of his copy of Stoffel's statement, some of the notes contained information which was not recorded in his official report. For example, Ledger noted that Stoffel had admitted to smoking cocaine and marijuana on several occasions, and that there was also a fanny-pack or backpack which was searched, but the official report did not reflect this. (Tr. at 127-130.)

While the investigators were at the house, Stoffel told them about two lawsuits. One lawsuit was between Stoffel and the Fond du Lac Sheriff's department, and the other was between Stoffel and an individual named Peter Holt. Stoffel told Ledger that she had received a $240,000 settlement in the Holt lawsuit. (Tr. at 140-42.) On redirect, Ledger stated that certain things were left out of his report because they were irrelevant. (Tr. at 155.)

19

**Investigator Eric Muellenbach**

Eric Muellenbach testified that he has been employed by the Fond du Lac County Sheriff's Department for seven years and has been assigned to the Winnebago Area Metropolitan Drug Enforcement Group for almost three years. Muellenbach authored an affidavit is support of a search warrant on April 19, 2005, for 517 Forest Avenue, Fond du Lac, Wisconsin. The affidavit was authored between the hours of 1:00 and 2:00 p.m. and was signed by Judge Weinke that same day. (Tr. at 183-86.)

Investigator Muellenbach found it necessary to apply for a search warrant for 517 Forest Avenue because contraband, i.e., marijuana and Vicodin pills, had been found in the house, and Muellenbach spoke with the owner of the house, Christopher Moses, but Moses denied consent to search the house. (Tr. at 186-87.) Muellenbach testified that some of the information he included in the affidavit was based on information provided by an anonymous source that Stoffel had purchased large quantities of cocaine and marijuana, or prescription pills in the past. (Tr. at 190-91.)

On cross-examination, Muellenbach testified that the investigators asked Stoffel several times for consent to search the house, but she would not give consent to search the entire house because she did not want to make Moses mad. Stoffel did, however, give consent to search her personal items in the house, and she gave the investigators permission to enter the house while they were still outside the house. (Tr. at 196-99.)

Once in the kitchen, a purse was searched and Vicodin pills were found inside. Muellenbach was with Ledger and Stoffel while they were having a discussion in the bedroom, but then Stoffel left the bedroom to call Moses, and Muellenbach went with her, leaving Ledger in the bedroom by

himself. (Tr. at 201-02.) Muellenbach first saw the marijuana when Ledger showed it to him; he did not see it in the jeans. (Tr. at 213.)

While they were at the residence, Stoffel told Muellenbach that she was suing his employer, the Fond du Lac Sheriff's Department. Furthermore, Muellenbach had known Stoffel for approximately four years previous to the events in question and had previously interacted with her socially, including going over to Stoffel's house. (Tr. at 205-08.)

**Christine Stoffel's Statement**

Although Stoffel did not testify at the evidentiary hearing, Moses offered as evidence a written statement purportedly made by Stoffel. According to the affidavit of Walter A. Piel, Jr., and Mr. Piel's in court testimony, he is an attorney who represented Moses in a related state court case. In conjunction with that representation, Piel spoke with Stoffel about the circumstances surrounding the search conducted on April 19, 2005. Stoffel then provided Piel with a written statement. Piel did not remember if Stoffel handed the statement to him or sent it by mail. (Tr. at 15-21.) Piel was not present when the statement was prepared, nor was the statement the product of questioning on his part. Furthermore, Piel did not recall how much time passed between his contact with Stoffel and his receipt of the statement. (Tr. at 21-25.) However, Piel verified that the statement which constitutes pages B-3 through B-16 of Defendant's Ex. 1 is the statement provided to him by Stoffel. The statement is not in affidavit form, nor is it notarized. The last page, however, states, "This report is true and accurate to the best of my knowledge," and is signed "Christine M Stoffel 5/10/05." (Def.'s Ex. 1 at B16.)

Over the objection of the government, the court admitted Stoffel's statement into evidence for all purposes. Hearsay evidence is admissible in a hearing on a motion to suppress. *See United*

21

*States v. Bolin*, 514 F.2d 554, 557 (7th Cir. 1975). A brief summary of the relevant portions of Stoffel's statement follows.

Stoffel's statement states that on April 19, 2005, Ledger and Muellenbach approached Stoffel while she was sitting on the porch of 517 Forest Avenue, Fond du Lac, Wisconsin. The investigators told Stoffel that they had received tips regarding her and illegal drug use. The statement then describes a conversation between Stoffel and the investigators regarding several individuals, including Stoffel's ex-boyfriend. (Def.'s Ex. 1 at B3-5.)

Muellenbach and Ledger then asked Stoffel if they could search her vehicle, she consented, and Muellenbach searched the vehicle. The investigators then asked to search Stoffel's purse. Stoffel said that she did not have a purse but did have a "mini-backpack." The investigators at no time asked to search the backpack. The investigators asked for permission to search the house, but Stoffel said that "its not my house, so it is up to the owner," Chris Moses. Stoffel stated that she does not pay rent to Moses and shares a bedroom with him. She classified their relationship as "friends." (Def.'s Ex. 1 at B5-6.)

The investigators again asked to search the house, and Stoffel again said she would have to speak with Moses. Stoffel went into the house to get her phone to call Moses, and the investigators followed her into the house and into the bedroom. She did not give them permission to enter the house. Stoffel "grabbed" her cell phone from in the bedroom and told the investigators, "we could go back outside." Stoffel thought Ledger was following immediately behind her as she exited the bedroom, but in fact Ledger lingered behind and was just leaving the bedroom as Stoffel got to the kitchen. (Def.'s Ex. 1 at B6-7.)

22

Stoffel reached Moses on the phone and began telling him about the investigators' requests to search. Muellenbach then took the phone to talk to Moses. At that point, Stoffel saw Ledger with his hands inside her mini-backpack. Stoffel told Ledger, "[s]top it, stop digging through my stuff." (Def.'s Ex. 1 at B7.) Over the phone, Moses refused consent to search until he could talk to his lawyer. The investigators then secured the house. The investigators repeatedly asked Stoffel for consent to search the house, and she repeatedly denied it. Stoffel said, "I don't have a problem with you guys searching my belongings, however, my belongings are inside Chris' house, and he said no, so that would be your answer, no search." In response to another request to search, Stoffel told the investigators that Moses was letting her stay there, and she didn't want to take the chance of not having a place to stay by consenting to a search when he said no. (Def.'s Ex. 1 at B8-9.)

At some point, Ledger took Stoffel into the bedroom to show her the marijuana. Ledger showed Stoffel a pair of jeans with a sandwich bag hanging out of the pocket. The bag had a small amount of green substance in it. Stoffel denied that the bag was hers and stated that Ledger had probably planted it along with her VA ID card which she had misplaced, but which Ledger said he found in the jeans. (Def.'s Ex. 1 at B9-10.) As to the generic Vicodin which Ledger located by going into Stoffel's backpack without her consent, Stoffel said she had receipts and bottles for them, but the pills were in a bag because hairspray had leaked on the pill bottles while on an airplane. (Def.'s Ex. 1 at B10.)

Muellenbach then left for two and a half hours while other officers stayed at the house with Stoffel. Moses arrived shortly after Muellenbach left, and both Moses and Stoffel talked with Moses' attorney over the phone. Muellenbach then called Moses and informed him that they had obtained a warrant. The officers immediately started searching the house. The officers allegedly

23

found weapons in the house, and after finding out that Moses a felon, arrested him. Stoffel denied any knowledge of the weapons. (Def.'s Ex. 1 at B11-12.)

Stoffel asked Ledger if she could go inside the house and lie down. Ledger said that she could, and upon going into the bedroom, Stoffel discovered that the "entire house was trashed," and several things were either broken or missing. Stoffel requested that Ledger give her back her ID and Hydrocodone (Vicodin) pills, and Ledger gave her 15 of the pills. The bomb squad then arrived and took the "explosives," at which point Muellenbach and Ledger left. (Def.'s Ex. 1 at B13-14.) In the statement, Stoffel also complained of several actions by the police officer which she found to be "offensive, non-professional, and just plain disrespectful." (Def.'s Ex. 1 at B14.)

## 2. Discussion

The resolution of Moses' motion to suppress boils down to the question of whether Christine Stoffel had authority to consent to a search of her belongings, specifically her purse or "mini-backpack" and personal items such as her jeans, which were located inside 517 Forest Avenue, Fond du Lac, Wisconsin, and whether she gave valid consent for those items to be searched. If Stoffel had authority to consent to the searches, and in fact did give consent, then Moses' motion must fail. This is so because the contraband in question here, the firearms, body armor, and explosive devices, were discovered pursuant to a search warrant issued by Circuit Court Judge Seven W. Weinke, based on information discovered by the investigators during the initial searches allegedly consented to by Stoffel.

Judge Weinke issued the warrant based on an affidavit prepared by Investigator Muellenbach attesting to items located inside 517 Forest Avenue. Specifically, Muellenbach's affidavit states that Vicodin pills were located at the house, but no prescription bottle could be produced for them, and

that a small bag of marijuana was located in the house. (Gov't's Ex. 1.) Both the Vocodin pills and the marijuana were discovered pursuant to the searches to which Stoffel allegedly consented. Based on this, Judge Weinke found probable cause and issued a search warrant to search for marijuana and drug paraphernalia. In the course of the ensuing search, the other contraband was found. In my opinion, without the Vicodin pills and marijuana, Muellenbach's affidavit would not have established probable cause to issue a warrant, and Judge Weinke would not have issued the warrant. Furthermore, if Stoffel did not consent to the initial searches of her belongings, and the investigators knowingly violated Moses' Fourth Amendment rights in searching them[5], then used what they found to obtain the warrant, the investigators cannot seek shelter in the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984). Therefore, the authority of Stoffel to consent to the searches, and the validity of her consent, is crucial.

A search authorized by consent is wholly valid as long as the consent was "freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The government bears the burden of establishing that consent was freely and voluntarily given. *Id*. Whether an individual voluntarily consented to a search is a factual assessment that turns on the totality of the circumstances. *United States v. Raibley*, 243 F.3d 1069, 1075 (7th Cir. 2001).

Furthermore, consent to search does not have to be given by the defendant. Consent is valid if it is given by a person with common control over the searched premises, or apparent authority to consent to the search. *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000). A person has apparent authority to consent to a search if "the facts available to the officer at the moment [would]

---

[5] The government does not dispute that although the items in question were Stoffel's personal belongings, Moses has Fourth Amendment standing to challenge their being searched. *See* Letter from the Government dated December 1, 2005.

25

warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quotation marks omitted).

Consent to a search is not an all or nothing proposition. "[A] person may limit or withdraw his consent to a search, and the police must honor such limitations." *United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986); *United States v. Mitchell*, 82 F.3d 146, 151 (7th Cir. 1996). "However, when a suspect does not withdraw his valid consent to a search before the illegal weapon or substance is discovered, the consent remains valid and the seized illegal item is admissible." *Mitchell*, 82 F.3d at 151. In this regard, "[t]he standard for measuring the scope of a suspect's consent . . . is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Some courts have held that once consent has been given, there must be an "unequivocal act or statement of withdrawal" to effectuate withdrawal of the consent. *United States v. Ross*, 263 F.3d 844, 846 (8th Cir. 2001); *United States v. Alfaro*, 935 F.2d 64, 67 (5th Cir. 1991).

Whether Stoffel had authority to consent to the searches of her belongings inside 517 Forest Avenue, and whether she did in fact consent, are in this instance, questions of credibility. If I credit Investigators Ledger and Muellenbach's testimony, then it is clear that Stoffel had at least apparent authority to consent to the searches, and did in fact give valid consent. Ledger testified that Stoffel said that she had been living at 517 Forest Avenue for a couple of months, that she had belongings inside the house, and that she had a key to the house. Ledger's testimony establishes that Stoffel represented herself as a joint occupant of the house, and she therefore had apparent authority to allow the investigators inside and to consent to a search. The investigators testified further that Stoffel consented to their entering the house while they were still outside the house, and then consented to

a search of her purse as well as her personal belongings in the bedroom of the house. The consent searches led to the discovery of the Vicodin pills and marijuana. Furthermore, the investigators' testimony establishes that Stoffel's consent was freely and voluntarily given.

If, on the other hand, I credit the out of court statement bearing Stoffel's signature, then even if Stoffel had authority to consent to a limited search, she did not do so. The statement clearly states that the investigators entered the house without consent, that Ledger searched Stoffel's backpack without consent, and that the marijuana was not Stoffel's, but was probably planted by Ledger.

I will start by noting that I found the testimony of Investigator Ledger and Investigator Muellenbach to be credible. They both testified in a forthright manner and did not appear to be evasive in any way. Furthermore, in my opinion, Ledger and Muellenbach are essentially disinterested witnesses. Moses presented evidence at the hearing in an attempt to show that Ledger and Muellenbach were not disinterested witnesses, but instead were biased against Stoffel. That evidence took the form of establishing that Ledger and Muellenbach at one point in time interacted socially with Stoffel. Both investigators admitted that they knew Stoffel because all three were employed in law enforcement, and indeed the investigators had visited Stoffel's home and shared friends with Stoffel. Defendant's Exhibits 3-7 are pictures of Ledger, Muellenbach, and other individuals interacting with Stoffel and her dog in what appear to be social settings. Indeed, in my opinion the pictures establish that at one point in time Ledger and Muellenbach did have a friendly relationship with Stoffel.

However, both investigators testified that the pictures were taken some time ago, and in any event, nothing about the pictures or the fact that a friendly relationship existed between Stoffel and the investigators suggests that they are now biased against her. Moses did not present any evidence

27

of a falling out or dispute between the investigators and Stoffel that might have led to a bias against Stoffel. It is Moses' contention that Ledger and Muellenbach formed a bias against Stoffel because she was a friend and fellow law enforcement officer gone bad, and that in some way offended them. Furthermore, Moses asserts that the investigators are biased against Stoffel because she was suing the City of Fond du Lac Sheriff's Department, which is Muellenbach's employer and is involved in some manner with funding Ledger's employment as well. (Def.'s Br. at 17.) But in order for this alleged bias to have any impact on the issues at hand, I would have to believe that Ledger and Muellenbach were so offended by Stoffel's alleged drug use and her law suit that they went to her house, performed an illegal search, planted illegal drugs in her jeans pocket, and then came into this court and committed perjury. Moses has not presented any evidence from which I can deduce such a remarkably deep personal animus.

Instead, it is my opinion that Ledger and Muellenbach are witnesses who are essentially disinterested. To be sure, Ledger and Muellenbach knew Stoffel and interacted with her socially some time ago, but if either of them has any personal interest in this case based on Stoffel's involvement, it is slight, and just as likely to be sympathetic as spiteful. In sum, I do not believe that Investigators Ledger and Muellenbach bear Stoffel any significant animus, and certainly not an animus that would lead them to want the "take down" Stoffel, at the cost of themselves having to disregard several laws.

Moses also attempts to cast doubt on the veracity of the investigators' testimony by pointing out alleged inconsistencies between Ledger's in court testimony and his previous statements, at least one of which Muellenbach allegedly adopted. (Def.'s Br. at 18-19.) However, in my opinion, the previous statements are not inconsistent with the investigators' in court testimony. The main alleged

28

discrepancy has to do with when the investigators asked Stoffel for consent to enter the house. In Ledger's police report he states, "Investigator W. Ledger followed Stoffel up the front porch steps and into the front door and Investigator W. Ledger asked Stoffel if he could follow her inside." (Def.'s Ex. 2 at 7.) While testifying in another court on the same matter, Ledger stated, "[w]e went inside the residence. I asked Miss Stoffel if we could follow her into the residence, and she said yes." (Tr. at 73-74.) Moses alleges that these statements are inconsistent with Ledger's testimony in this court that he asked Stoffel for permission to enter the house before entering. In my opinion, Ledger's two previous statements do not definitively establish that he was already inside the house when he asked for consent to enter. All three statements are consistent with a fluid exchange where Ledger asked for consent to enter the house as he was walking up the porch steps in order to enter the house, as he testified in this court. (Tr. at 74.) Ledger's previous statements do not suggest to me that he is lying or being evasive.

Turning now to Stoffel's out of court statement, in considering the evidentiary value of the statement, I place very little weight on it. First of all, the statement was made out of court, and as such, the parties have had no opportunity to test Stoffel's statement for veracity or accuracy. I am satisfied that the statement is Stoffel's. Attorney Piel testified that he asked Stoffel to provide a statement, and although he did not remember if the statement was given to him personally or by mail, he testified that Defendant's Exhibit 1 contained a copy of the statement provided to him by Stoffel. The statement is also signed by Stoffel, albeit the signature is not notarized nor has it been attested to in court. Furthermore, the statement contains a detailed narrative, written in the first person, which is consistent in many points with Ledger and Muellenbach's testimony. This suggests that it was written by someone who was present while the events described transpired, i.e., Stoffel.

29

However, there is no way of knowing when or under what circumstances the statement was written. Moreover, Stoffel is deeply personally interested in this matter. The search conducted at 517 Forest Avenue has led to felony charges being filed against Moses, the person with whom Stoffel was living at the time, as well as state charges against Stoffel herself. Stoffel therefore has great incentive to cast the legality of the search into doubt. Moreover, the statement expresses Stoffel's concern that allowing a search of Moses' house might jeopardize her ability to stay there. This concern provides a further reason for Stoffel to minimize her role in consenting to searches which eventually did lead to Moses' house being searched. And finally, the statement itself does not seem credible to me. For example, Stoffel claims that she had 48 Vicodin pills in a bag, rather than prescription pill bottles, because a hairspray bottle leaked on the pill bottles. While not impossible, this explanation seems to me to be rather contrived. The prescription bottle which Stoffel did produce only accounted for 15 Vicodin pills. The hairspray bottle would have had to leak on a number of separate prescriptions all being carried together; in my view, an unlikely scenario.

In the end, I do not find the out of court statement bearing Stoffel's signature to be compelling evidence. I therefore do not credit the statement's claims that Stoffel did not give the investigators consent to enter the house and search her personal belongings therein. Instead, I credit Investigator Ledger and Investigator Muellenbach's testimony that Stoffel freely and voluntarily consented to the investigators entering the house and searching her personal belongings.

Moses argues that the court should draw a negative inference against the government because of the government's refusal to immunize Stoffel. In essence, Moses argues that because the government refused to immunize Stoffel, the court should draw the inference, not only that if immunized Stoffel would testify consistently with her previous statement, but that the statement is

30

the truth. (Def.'s Br. at 24.) Indeed, as the cases cited by Moses instruct, in situations where one party destroys or tampers with evidence, it can be readily inferred that the evidence would have been favorable to the other side. *Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha*, 102 F.2d 450, 453 (2nd Cir. 1939) (L. Hand, J.); *Nation-Wide Check Corp., Inc. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 217-18 (1st Cir. 1982).

An adverse inference might also be appropriate in cases where witnesses are not produced by a party when that witness was peculiarly within that party's power. *United States v. Addo*, 989 F.2d 238, 242 (7th Cir. 1993); *United States v. Mahone*, 537 F.2d 922, 926 (7th Cir. 1976). However, the adverse inference is an inference that *may* be drawn, it is not an inference that *must* be drawn. *See United States v. Pizarro*, 717 F.2d 336, 345-46 (7th Cir. 1983).

It is unnecessary for this court to determine if the government's refusal to immunize a potential defense witness is a situation where the witness is "peculiarly" within the government's power, such that an adverse inference is appropriate, i.e., if an instruction informing a jury that they may draw an adverse inference would be appropriate. This is so because in the circumstances at hand, I am the fact finder, and even assuming that an adverse inference is allowable, I decline to draw one.

The adverse inference is based on the common sense observation that a party who destroys evidence, or keeps it from the fact finder, likely does so because the evidence is harmful to their interest. *See Nation-Wide Check Corp.,* 692 F.2d at 218. But when the government has not destroyed evidence, or actively kept a witness from testifying, but simply refuses to grant immunity to a potential witness, common sense does lead to the same conclusion. It may be that the government is refusing immunity for no other reason than it does not want to foreclose the possibility

of future prosecution based on what Stoffel might say on the stand. After all, the reason the investigators initially went to 517 Forest Avenue was because they had information concerning Stoffel and illegal drug use.

Furthermore, as I have stated above, there are reasons to believe that Stoffel's out of court statement is not reliable. Stoffel has a strong interest to discredit the legality of the search that was conducted, and some claims in the statement itself are suspect. This being the case, any possible "common sense" conclusion that the government's refusal to immunize Stoffel indicates that what she said in her statement, and would presumably say in court, is the truth, is substantially weakened.

In sum, I am unwilling to draw an adverse inference based on the government's refusal to grant Stoffel immunity for her testimony. I do not think, under the circumstances of this case, that the government's refusal to immunize Stoffel indicates that Stoffel would testify consistently with her out of court statement and that such testimony would be true.

For all of the aforementioned reasons, I credit the testimony of Investigators Ledger and Muellenbach. I find that Stoffel had at least apparent authority to consent to searches of her personal belongings located in the house at 517 Forest Avenue, Fond du Lac, Wisconsin. Furthermore, I find that Stoffel freely and voluntarily consented to the investigators entering the house and searching her personal belongings. Therefore, the investigators did not violate Moses' Fourth Amendment rights by searching Stoffel's personal belongings located inside Moses' house. Moreover, having found that Stoffel did consent to the searches, Moses' argument based on *Franks v. Delaware*, 438 U.S. 154 (1978), must also fail. It will therefore be recommended that Moses' motion to suppress evidence be denied.

## IV. RECOMMENDATIONS

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's motion to dismiss the indictment be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the defendant's motion to compel an immunity request, or dismiss the indictment for failure to grant immunity, be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the defendant's motion to suppress evidence be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) - (C), Federal Rule of Criminal Procedure 59(b)(2), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

**SO ORDERED** this 16th day of December 2005, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

33