# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    **v.**                            **Case No. 05-CR-200**

**CHRISTOPHER MOSES**
        **Defendant.**

---

## DECISION AND ORDER

Defendant Christopher Moses was charged with possessing firearms as a convicted felon (count one), possessing body armor subsequent to his conviction of a crime of violence (count two), and possession of unregistered destructive devices (counts three through seven). He filed a motion to dismiss the indictment on the ground that count one violated his equal protection rights, count two failed to allege a predicate offense that qualified as a crime of violence, and counts three through seven were multiplicitous. He also filed motions to suppress evidence seized from his home and to compel the government to grant immunity to a witness who had asserted her Fifth Amendment privilege so that she would testify at the suppression hearing,

The motions were assigned to a magistrate judge, who recommended that they be denied. Defendant objected, and on February 10, 2006, I issued a decision denying the motion to dismiss count one and counts three through seven. I then held a status conference, requesting additional information on count two and exploring the validity of the witness's invocation of privilege. The government provided the requested information on count two, and defendant, having again explored the issue with the reluctant witness and

her counsel, advised that she continues to refuse to testify without a grant of immunity. Neither party has requested a de novo evidentiary hearing. Therefore, the motions are ready for decision. My review of the recommendation is de novo. Fed. R. Crim. P. 59(b).

## I. MOTION TO DISMISS COUNT TWO

Defendant is charged in count two with violating 18 U.S.C § 931(a), which forbids the possession of body armor by a person previously convicted of "a crime of violence." The term "crime of violence" is defined in 18 U.S.C. § 16 as follows:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The government alleges in the indictment that defendant's prior conviction of fleeing an officer, contrary to Wis. Stat. § 346.04(3), constitutes a crime of violence. Section 346.04(3) provides:

> No operator of a vehicle, after having received a visual or audible signal from a traffic officer, or marked police vehicle, shall knowingly flee or attempt to elude any traffic officer by willful or wanton disregard of such signal so as to interfere with or endanger the operation of the police vehicle, or the traffic officer or other vehicles or pedestrians, nor shall the operator increase the speed of the operators vehicle or extinguish the lights of the vehicle in an attempt to elude or flee.

In determining whether this offense constitutes a "crime of violence" under 18 U.S.C. § 16, I "look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to [defendant's] crime." Leocal v. Ashcroft, 125 S. Ct. 377, 381 (2004); see also Taylor v. United States, 495 U.S. 575, 600 (1990) (requiring use of a "categorical approach" to determine whether a prior offense constitutes a "violent felony").

2

<u>Leocal</u> and <u>Taylor</u> require the court to first examine the statute of conviction.  However, if the statute may be violated in two ways, one within the scope of the federal recidivism statute and the other without, the court may engaged in a limited inquiry to determine how the defendant's offense was committed.  <u>United States v. Sperberg</u>, 432 F.3d 706, 708 (7th Cir. 2005).  Under this "modified categorical approach," the court may "examine the charging papers and plea colloquy to determine which variety of offense the conviction reflects."  <u>Sperberg</u>, 432 F.3d at 708 (citing <u>Shepard v. United States</u>, 125 S. Ct. 1254, 1257 (2005)).  But the court may not go further, examining police reports, for example. See <u>Sheperd</u>, 125 S. Ct. at 1260-61.

In the present case, I noted that fleeing under Wisconsin law can be committed in three different ways – (1) by interfering with or endangering the operation of the police vehicle or other vehicles or pedestrians; (2) by increasing speed; or (3) by extinguishing the lights.  <u>See</u> Wis. JI-Criminal 2630 (2003); <u>see also</u> <u>State v. Sterzinger</u>, 256 Wis. 2d 925, 931 (Ct. App. 2002).  I therefore requested information, consistent with <u>Shepard</u>, on the manner in which defendant committed the offense.  The government submitted a copy of the criminal complaint, which charged defendant with disregarding the officer's signal "so as to endanger the operation of the police vehicle."  (R. 44 Ex. A.)  The government also filed judicial records indicating that defendant pleaded guilty to the offense.

Defendant objected to the consideration of this information, arguing that <u>Shepard</u> was a case arising under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), which carries its own definition of "violent felony," not 18 U.S.C. § 16.  He argued that <u>Leocal</u> controls, and it allows consideration only of the statutory elements of the offense. He further argued that because the fleeing statute can be violated in several ways, and

3

there is no way to tell if the particular offense is a crime of violence without looking to the underling facts (which Leocal forbids), the rule of lenity requires that count two be dismissed.

Defendant's argument fails. There is no reason to disallow use of the modified categorical approach in this context. Leocal did not forbid its use, and the lower federal courts have employed it, post-Leocal, in cases under § 16. See, e.g., Penuliar v. Gonzales, 435 F.3d 961, 968 (9th Cir. 2006); United States v. Montenegro-Recinos, 424 F.3d 715, 717 (8th Cir. 2005), cert. denied, 74 U.S.L.W. 3473 (U.S. Feb 21, 2006).[1]

In any event, I find that the motion must be denied under either approach.

## A.    Categorical Approach

In Leocal, the Supreme Court explored the meaning of § 16 in holding that drunk driving did not quality as a "crime of violence." The Court first stated that: "The plain text of § 16(a) states that an offense, to qualify as a crime of violence, must have 'as an element the use, attempted use, or threatened use of physical force against the person or property of another.'" Leocal, 125 S. Ct. at 382. The parties and the magistrate judge all agreed that § 346.04(3) does not contain such an element, and I concur. I must therefore determine whether fleeing qualifies under § 16(b).

> Section 16(b) sweeps more broadly than § 16(a), defining a crime of violence as including "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." But § 16(b) does not thereby encompass all negligent misconduct, such as the negligent

---

[1]Defendant's argument is also something of a Catch-22. He contends that because some variations of the offense may not constitute crimes of violence and the government is forbidden to present any information on the variation he committed, the charge must be dismissed, even if his prior offense was in fact a crime of violence.

operation of a vehicle. It simply covers offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense. The reckless disregard in § 16 relates not to the general conduct or to the possibility that harm will result from a person's conduct, but to the risk that the use of physical force against another might be required in committing a crime.

Leocal, 125 S. Ct. at 382-83. Thus, under § 16(b), the risk that the offender will use physical force must be "substantial," and he must act with a sufficiently culpable state of mind, for § 16(b) requires "a higher mens rea than . . . merely accidental or negligent." Leocal, 125 S. Ct. at 383; see also United States v. Rutherford, 54 F.3d 370, 373 (7th Cir. 1995) ("In ordinary English, the word 'use' implies intentional availment.").

The Seventh Circuit has not decided whether fleeing under Wisconsin law qualifies as a "crime of violence" under § 16. However, it has held that fleeing constitutes a "violent felony" under the ACCA. United States v. Howze, 343 F.3d 919, 922 (7th Cir. 2003). Under the ACCA, a "violent felony" as an offense that:

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]

18 U.S.C. § 924(e)(2)(B). In Howze, the court noted that § 922(e) was concerned with an assessment of the risk that someone would be hurt during flight to avoid apprehension. The court concluded that bystanders were in particular jeopardy during such flight, and that collisions between fleeing vehicles and others were common. 343 F.3d at 922.

As the Seventh Circuit recently recognized in Sperberg, the standards under § 924(e) and § 16 are different. The former is concerned with the possible results – does the defendant's crime present a serious risk to others (even if the defendant does not intend

5

to harm anyone), while the latter focuses on the defendant's <u>conduct</u> – is it probable that the offender will intentionally or recklessly "use" physical force. <u>See</u> 432 F.3d at 709. Therefore, I must decide whether fleeing presents a substantial risk that the offender will recklessly or intentionally "use" physical force against the person or property of another in the course of committing the offense.

It appears that the only federal court to consider a fleeing-type statute under § 16 is the Ninth Circuit Court of Appeals. In <u>Penuliar</u>, the court held that California's evading an officer statute did not categorically describe a crime of violence under § 16. 435 F.3d at 967-68. California Vehicle Code § 2800.2(a) makes it a crime "if a person flees or attempts to elude a pursuing peace officer . . . and the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property." The statute explains that "willful or wanton disregard for the safety of persons or property includes, but is not limited to, driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more [traffic] violations . . . occur, or damage to property occurs." <u>Id.</u> at 967. The Ninth Circuit found that, under <u>Leocal</u>, a violation of this statute did not necessarily amount to a crime of violence because "it would be possible to engage in 'willful or wanton disregard for the safety of persons or property' by negligently committing three Vehicle Code violations." <u>Id.</u> at 967-68. The court further noted that three vehicle equipment or registration offenses could suffice; the offender need not even commit moving violations in order to be convicted. <u>Id.</u> at 967 n.3.

The <u>Penuliar</u> court noted that it had previously held that evading an officer under the 1992 version of the California statute constituted a crime of violence. <u>Id.</u> at 968 (citing <u>United States v. Campos-Fuerte</u>, 357 F.3d 956 (9th Cir. 2004)). However, the evading

6

statute at issue in Campos-Fuerte had been construed to equate "wilful or wanton" with

"'intentional wrongful conduct, done either with a knowledge that serious injury to another

will probably result, or with wanton and reckless disregard of the possible results.'" 357

F.3d at 961 (quoting Rost v. United States, 803 F.2d 448, 450-51 (9th Cir. 1986)). Thus,

the Campos-Fuerte court found that, under the statute, "[w]illful or wanton misconduct is

at least the equivalent of recklessness." Id. The statute was amended in 1996 to include

the possibility of violation via the commission of three traffic violations, which called for a

different result in Penuliar. See 435 F.3d at 968.

The Wisconsin statute at issue in the present case is more like the 1992 California

law than the amended 1996 provision. And, under the rationale of Leocal and Campos-

Fuerte, I conclude that § 346.04(3) describes conduct that presents a "substantial risk that

physical force against the person or property of another may be used in the course of

committing the offense," and that such force will be used recklessly or intentionally.

I first note that the statute requires a mental state greater than negligent or

accidental. The statute has three elements:

> (1)    The defendant operated a motor vehicle on a highway, after having received
> a visual or audible signal from a traffic officer, or marked police vehicle;
>
> (2)    The defendant knowingly fled or attempt to elude a traffic officer;
>
> (3)    (a) by wilful disregard of such signal so as to interfere with or
> endanger the operation of the police vehicle, or the traffic officer or
> other vehicles or pedestrians;
>
> (b) by increasing the speed of the vehicle in an attempt to elude or flee; or
>
> (c) by extinguishing the lights of the vehicle in an attempt to elude or flee.

7

Wis JI-Criminal 2630; <u>Sterzinger</u>, 256 Wis. 2d at 931-32. The second element requires that the defendant act knowingly, which under Wisconsin law means intentionally. This is not a strict liability offense, <u>Sterzinger</u>, 256 Wis. 2d at 931, as is drunk driving under Wisconsin law, <u>State v. Ventrice</u>, 2002 WI App 34. Thus, § 346.04(3) does not suffer from the primary flaw found in <u>Leocal</u> – it requires an elevated mens rea.

I also find that the conduct covered by the statute involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. As the Wisconsin Court of Appeals explained in <u>Sterzinger</u>, the legislature was concerned with "risk-creating behavior" – operation that endangers the officer, other vehicles, or pedestrians; or increasing speed, or extinguishing the lights, in an attempt to flee or elude. 256 Wis. 2d at 936-37. "Increasing a vehicle's speed or extinguishing its lights while fleeing or attempting to elude an officer present obvious and inherent safety risks which the legislature deemed sufficient for the imposition of criminal liability." <u>Id.</u> at 937. This is essentially what the Seventh Circuit held in <u>Howze</u>. However, I also find that there is a substantial risk that the defendant will intentionally or recklessly use force against the person or property of another in the course of committing the offense. For instance, it is certainly foreseeable that the defendant would intentionally or recklessly use his car to ram the officer or his squad car, other vehicles in the vicinity, or a pedestrian in the course of completing the offense. The force necessary under § 16 need not be used against "the victim" of the crime, as defendant suggested. Rather, there must be a substantial risk that force will be used against "another" during the commission of the offense. Further, force against another's property (e.g., her car) suffices under § 16.

8

Finally, courts have held that the similar crime of escape constitutes a crime of violence under § 16. For instance, in <u>United States v. Aragon</u>, 983 F.2d 1306, 1313 (4th Cir. 1993), the court concluded that given the supercharged emotions involved, there was a substantial risk that physical force would be exerted against some person or some property in the course of trying to get away. Like an escape, fleeing also involves supercharged emotions and a substantial risk that the defendant will use force in attempting to evade the police.

Therefore, for all of these reasons and those stated by the magistrate judge, I find that fleeing under Wis. Stat. § 346.04(3) categorically qualifies as a crime of violence.

## B.    Modified Categorical Approach

My concern in requesting information about the manner in which defendant's fleeing offense was committed was that extinguishing the vehicle's lights, unlike increasing speed or operating in a manner that endangers others, might not present the same degree of risk that force will be used. The first two ways of violating the statute clearly involve such a risk; the third suggests a more surreptitious method of fleeing, one that does not necessary suggest a risk that the offender will forcefully impact others.[2] Based on the risks inherent in any type of fleeing, I believe that all violations of § 346.03(4) qualify as crimes of violence under § 16, as discussed above. To the extent that there is any doubt in the present case, the criminal complaint to which defendant pled guilty indicates that defendant disregarded the officer's signal and operated his vehicle so as to endanger the operation

---

[2]Clearly, driving without lights at night is risky behavior, but the greatest risk is that another driver will not see the fleeing offender and will collide with him, not the other way around.

of the police vehicle.  This plainly falls within the definition of crime of violence in § 16.  For this reason, as well, the motion is denied.

## II.  MOTION TO COMPEL GRANT OF IMMUNITY

### A.    Background

The charges in the indictment arose out of a search of defendant's home pursuant to a warrant.  The warrant, in turn, was obtained based on observations made during a partial search of the premises pursuant to the alleged consent of defendant's living companion, Christine Stoffel.  Defendant filed a motion to suppress, claiming that Stoffel had not consented to the search, and that the statement to the contrary in the warrant application was false.  See Franks v. Delaware, 438 U.S. 154 (1978).  He also claimed that Stoffel did not have the authority to consent to the officers' entry into his residence.

Defendant subpoenaed Stoffel to testify at the evidentiary hearing scheduled by the magistrate judge.  Represented by counsel, Stoffel advised the magistrate judge that if called she would assert her Fifth Amendment rights and refuse to testify.  (Tr. at 9.) Defendant requested that the government grant Stoffel immunity, but the government refused, causing defendant to file a motion to compel the grant of immunity.

In the motion, defendant stated that Stoffel was the only witness who could establish that the officers did not have consent to enter, violated defendant's rights in doing so, and submitted a false warrant application by claiming that consent was obtained.  He submitted a written statement from Stoffel detailing her version of events.  (Def. Ex. 1.)[3]  He argued

---

[3]This statement was created by Stoffel at the request of defendant's counsel in state court, where he was initially charged with these offenses.  The state prosecution was dismissed when the government obtained the instant indictment.  (Tr. at 16-17.)

10

that by denying his immunity request the government was preventing him from presenting a defense and denying him due process of law. Like the magistrate judge, I will address this issue before turning to the suppression motion.

## B. Applicable Legal Standard

The Seventh Circuit recently explained the law on this issue:

> The United States Attorney has authority to grant immunity to a witness; federal courts, by contrast, play only a ministerial role in ensuring that this power is properly exercised. United States v. George, 363 F.3d 666, 671-72 (7th Cir. 2004). Criminal defendants have a fundamental due process right to present witnesses who will testify on their behalf. [United States v.] Hooks, 848 F.2d [785, 799 (7th Cir. 1988)]. What is more, these witnesses must be free to testify without fear of retaliation. See, e.g., Webb v. Texas, 409 U.S. 95, 98 (1972) (reversing a conviction where the trial judge's warnings to the defendant's only witness deterred him from testifying). The prosecutor's broad discretion to refuse immunity is limited by the defendant's due process rights. United States v. Schweihs, 971 F.2d 1302, 1315 (7th Cir. 1992). A defendant's due process rights are violated when the prosecutor abuses his authority to immunize witnesses with the intention of distorting the fact-finding process. Id. Although a federal court cannot order the government to immunize a defense witness, courts can dismiss an indictment where the prosecutor's refusal to grant immunity has violated the defendant's right to due process. United States v. Herrera-Medina, 853 F.2d 564, 568 (7th Cir. 1988).

United States v. Burke, 425 F.3d 400, 411 (7th Cir. 2005).[4] However, the defendant must make a substantial showing that the government intended to distort the fact-finding process before the court may act. Hooks, 848 F.2d at 799, 802.

---

[4]In his motion, defendant cited United States v. Moussaoui, 382 F.3d 453, 468 (4th Cir. 2004), cert. denied, 125 S. Ct. 1670 (2005), in which the court noted that in some circumstances the district court could compel a grant of immunity. The Seventh Circuit has held that the remedy for the government's improper refusal is not to compel immunity but rather to dismiss the indictment. See Burke, 425 F.3d at 411. Thus, like the magistrate judge, I will proceed under the assumption that if the government acted improperly in the present case the remedy would be dismissal.

Case 2:05-cr-00200-LA   Filed 03/10/06   Page 11 of 28   Document 46

## C. Discussion

Defendant has failed to make the necessary showing. First, there is no indication that the government in any way threatened or intimidated Stoffel – or even spoke to her – prior to her invocation of the privilege. Thus, there can be no claim that the government was responsible for her decision. See Hooks, 848 F.2d at 801-02; see also Herrera-Medina, 853 F.2d at 568 (positing that "sharp" tactics such as threatening a witness the government had no intention of prosecuting might require dismissal).

Second, defendant has failed to demonstrate that the government abused its discretion to grant immunity in order to distort the fact-finding process. "The government has broad discretion in its grants of immunity. It is the prerogative of the Attorney General and his designees to determine whether a grant of immunity is 'in the public interest' under 18 U.S.C. § 6003." Hooks, 848 F.2d at 802. "Indeed, it is his prerogative to decide not to seek immunity simply because the government would gain nothing and the immunity would hinder future actions." Id. Although the government has indicated that Stoffel is not now a target of federal prosecution, this – coupled with defendant's proffer that Stoffel would testify in a manner favorable to him – cannot be sufficient. If it were, grants of immunity would be the rule rather than the exception.

Therefore, for these reasons and those stated by the magistrate judge, I deny the motion to dismiss on this ground.[5] I turn now to the motion to suppress.[6]

---

[5]As noted, the motion was styled as one to compel a grant of immunity. In this circuit, district courts are dis-empowered from granting such relief. Even if I could do so, for the reasons stated in the text, I would deny the motion.

[6]During the telephonic status conferences I held with the parties, I questioned the propriety of Stoffel's blanket invocation. I noted that her state prosecution for possession

### III.  MOTION TO SUPPRESS

**A.      Facts**

      **1.      Officers' Testimony**

Investigator William Ledger of the Lake Winnebago Area Metropolitan Enforcement Group drug unit testified that he and his partner, Investigator Eric Muellenbach, received a tip that Christine Stoffel possessed illegal drugs.  (Tr. at 33; 204.)  The tipster told Ledger approximately where Stoffel lived and provided a description of her vehicle.  On April 19, 2005, Ledger and Muellenbach located the vehicle parked in the driveway at 517 Forest Avenue, in the City of Fond du Lac, ran the plates, and found that it registered to Stoffel. (Tr. at 33-34.)

As they approached the home, the officers saw Stoffel sitting on the front porch. Ledger testified that he recognized Stoffel because she had worked for the Sheriff's department and they had previous contacts.  (Tr. at 35-36.)  Ledger testified that he greeted Stoffel and stated that he wanted to talk to her about an anonymous complaint regarding drug activity.  Stoffel denied possessing any illegal drugs.  (Tr. at 37.)  She

──────────────────────

of marijuana had been resolved, and that her testimony as to the circumstances of the officers' entry into the home she shared with defendant was quite unlikely to incriminate her further.  Questioning as to the ownership or possession of any contraband found in the house would be irrelevant for purposes of this motion.  Nevertheless, courts may not reject a witness's invocation unless her fear of self-incrimination is "fanciful."  Herrera-Medina, 853 F.2d at 568.  It is theoretically possible Stoffel could be prosecuted for possession of drugs or other items found in the house.  See In re Corrugated Container Antitrust Litigation. 661 F.2d 1145, 1151 (7th Cir. 1981); see also United States v. Mabrook, 301 F.3d 503, 506-07 (7th Cir. 2002) (holding that even though defendant had been prosecuted for mail and wire fraud, he was still subject to state prosecution or additional federal charges).  Therefore, I saw no basis to reject her invocation and enforce the subpoena. That said, it did seem to me that this entire dispute was unnecessary.

surmised that the tipster was an ex-boyfriend, Scott Heines,[7] and stated that he was a drug dealer, drank a lot and should not be trusted. She also mentioned that he had been breaking to her house and was angry that law enforcement had done nothing about her burglary complaints. (Tr. at 222-24.)

Ledger asked for consent to search Stoffel's vehicle, and she agreed. (Tr. at 37.) Ledger testified that Stoffel was cooperative, unlocked the vehicle, and Muellenbach searched it. (Tr. at 38.) Nothing was found in the vehicle. (Tr. at 39.)

While the vehicle search was being conducted, Ledger conversed with Stoffel, asking how long she had lived at the residence. Stoffel stated that she had lived there a few months, kept personal belongings in the house and had a key. (Tr. at 40.) The officers asked for permission to search the house, but Stoffel declined, stating that would be up to defendant, who owned the house. (Tr. at 196.) Ledger then asked for permission to search Stoffel's personal belongings, and she stated that her purse was in the kitchen. Ledger testified that she started to walk inside, he asked if he could follow, and she said yes. (Tr. at 41.) Ledger testified that once in the kitchen he asked Stoffel if he could search her purse, and she agreed. Inside a center pocket, Ledger found 48 Vicodin pills in a sandwich bag. (Tr. at 42-43.) Ledger testified that this confirmed the information he was given, that Stoffel had a large amount of prescription medication that she was trading for crack cocaine. (Tr. at 47.) Ledger said that Stoffel told him the pills were in a bag because some hair spray had exploded in her luggage during a flight and gotten on the

---

[7]In her statement, Stoffel spelled his name "Hindes." (R. 19 Ex. B-3.) I will use the spelling from the transcript of the evidentiary hearing.

14

prescription bottles.  (Tr. at 45.)  Stoffel was able to provide one prescription bottle for 15

pills, so Ledger gave her back 15 pills and seized the rest.  (Tr. at 46.)

  Ledger testified that he next asked Stoffel if she had any other personal property in

the house, and she led him to a bedroom she shared with defendant, where she consented

to a search of her personal property.  She also attempted to contact defendant.  (Tr. at 47-

48.)  In the bedroom, Ledger saw a closed circuit TV for a surveillance camera pointed out

the front of the residence, which caught his attention.  Stoffel said the camera was there

because of her ex-boyfriend's break-ins.  (Tr. at 49-50.)

  Over the back of a chair in the bedroom, Ledger testified that he saw a pair of

women's jeans, with a small baggy of suspected marijuana hanging out of the pocket.

Ledger testified that Stoffel had left the room (with Moellenbach) to make a phone call

when he made this observation, and Ledger had her come back in.  (Tr. at 51, 93; see also

Tr. at 202.)  He then pointed to the baggy, picked it up, and examined it.  He asked Stoffel

if the pants were her's and she said they were, but that she did not know who the

marijuana belonged to.  Ledger seized the baggy.  (Tr. at 52.)  He also found in the pants

a prescription medication card with Stoffel's name and picture on it.  (Tr. at 53.)

  They then returned to the kitchen, and Stoffel was able to reach defendant by

phone.  Defendant got on the phone with Ledger and said that he did not want the house

searched any further.   (Tr. at 53; see also Tr. at 187.)  Ledger testified that he and

Mullenbach then secured the residence and called for other officers to assist in securing

the residence and executing the search warrant he planned to obtain.  Muellenbach then

applied for and was granted a warrant by a Fond du Lac County judge.  (Tr. at 54-55; 187-

88.)  Once the other officers arrived, they "staged directly inside the front door."  (Tr. at 56.)

15

One of the other officers went upstairs to check for other people inside the house (Tr. at 57), but no other search was done (Tr. at 96). The warrant was returned about 2 ½ hours later. (Tr. at 58.) While waiting, Ledger said that he, Stoffel and the other officers made small talk. (Tr. at 59.) At some point before the warrant was signed, defendant arrived. After he was advised of the warrant, Ledger told Stoffel and defendant that they were to stay outside while the warrant was executed. (Tr. at 60.) Officers found three handguns, an assault rifle, about one thousand rounds of ammunition, two electric stun guns, two halves of a ballistics vest, and several rounds of 40 mm explosive devices. (Tr. at 61.)

On cross examination, Ledger stated that he had interacted with Stoffel socially prior to this incident, been to her home, and played with her dog. (Tr. at 82-83, 87-88; 206-07.) Defendant introduced photos of Ledger with Stoffel, one of which depicted them hugging. (Tr. at 87.) However, Ledger testified that he had not had contact with Stoffel, personal or professional, for three to four years prior to the search. He said that during the time when he had social contact with her, he considered her an acquaintance rather than a friend, part of a group that hung out together. (Tr. at 150-51.) The defense also introduced photos of Moellenbach with Stoffel and her dog, some of which were taken at Stoffel's house. Moellenbach estimated that the pictures were taken more than three years ago. He stated that, at the time, Stoffel was a friend (Tr. at 207-09), and that his last contact with her prior to April 19, 2005 was two to three years ago. (Tr. at 216).

Ledger was provided with a copy of Stoffel's written statement prior to the hearing, and he made some notes in the margin concerning issues with which he disagreed. (Tr. at 104-05, 121.) Between the first and second days of the hearing, Ledger made additional notes on the statement. (Tr. at 126.) Specifically, he added a note by the final paragraph

16

on page B/5 stating, "False. Admitted to smoking marijuana and cocaine on several occasions." (Tr. at 127.) On page B/7, he added: "purse, fanny-pack and other items." (Tr. at 128-29.) On page B/9, he added: "No. We entered the house about 12:15, and Muellenbach left to get the warrant at one o'clock, equaling 45 minutes." (Tr. at 131.) He further added on page B/4 that he had "information from other anonymous sources that [Stoffel] was getting cocaine from Rick Bader, and crack from Mike Ford. Also that she was trading her pills for cocaine and crack." (Tr. at 132, 164.)

In another note on the document, Ledger referred to a $245,000 settlement Stoffel had received from a man named Peter Holt for an alleged assault and a possible lawsuit Stoffel considered filing against the Fond du Lac County Sheriff's Department. Ledger stated that he discussed these issues with Stoffel on April 19, 2005, but did not mention them in his police report because he considered them unimportant to the investigation. (Tr. at 139-42.)

### 2. Stoffel's Statement

In her statement, Stoffel gave a different version. She stated that Muellenbach and Ledger approached her while she was sitting on the porch and stated that they had received tips that she possessed illegal drugs. She stated that the tips, which came from an ex-boyfriend who was trying to make her life a "living hell," were not true. (R. 11 Ex. B-3.) She complained that the officers believed Heines's allegation, despite the fact that he drank and used drugs, and did nothing about his break-ins of her house. The officers then asked to search her vehicle, and she agreed. Muellenbach searched, while Ledger told her that if she was using drugs she should talk to someone to get help. Stoffel insisted that she was not using illegal drugs. (Id. at B-5.)

17

After Muellenbach completed the vehicle search, the officers asked to search her purse. Stoffel replied that she did not use a purse but rather a mini-backpack. The officers then asked to search the house, to which Stoffel replied it was not her house and it was up to defendant, the owner. (Id. at B-6.) The officers asked Stoffel to call defendant, she agreed and started walking into the house to get a phone. The officers followed her inside without asking permission. They proceeded to the bedroom, where Stoffel got her cell phone. She walked back out into the kitchen, believing that the officers were behind her. She managed to get defendant on the phone, and Muellenbach asked to speak to him. Stoffel stated that at that time she saw Ledger searching her mini-backpack and told him to stop, but he kept digging through the bag. (Id. at B-7.)

Defendant told Muellenbach that he was calling his lawyer and that the officers could not search. The officers then decided to secure the house and directed Stoffel back to the front porch. A city police officer, Dave LeCaptain, then arrived. Stoffel stated that Ledger and Muellenbach went in and out of the house several times, and one of them grabbed a kitchen chair, upon which Ledger sat just inside the front door while waiting for defendant (and later Muellenbach after he left to get the warrant). LeCaptain sat or stood on the porch. On the porch, Ledger and Muellenbach asked Stoffel over and over if they could search, and she responded that defendant said no and because it was his house she had to respect that. (Id. at B-8.) The officers said that if they searched now it would be a clean sweep, but if they had to get a warrant, they would trash the place. (Id. at B8 - B-9.) The officers had her call defendant again, and he again said no search. Defendant further stated that he was on his way home. (Id. at B-9.)

18

Ledger then asked Stoffel whose marijuana was in the bedroom.  She asked him to repeat himself, to which he said, "Come here, I'll show you."  (Id. at B-9.)  Ledger then took her to the bedroom and showed her a pair of pants hanging over a desk drawer, which had not been there when she went into the room to get her cell phone.  A sandwich bag was hanging out of the pocket, and Ledger reached in and pulled out a baggy with a small amount of greenish material in it.   Ledger handed her the bag and asked if it was marijuana, and she handed it back and said she did not know.  Ledger then asked if the pants were her's, and Stoffel said she did not know.  (Id.)  Ledger replied that they were not a man's jeans, and he held up Stoffel's medical ID card, which he said he found in the pants.  (Id. at B-9 - B-10.)  Stoffel said, "Chances are that was planted, just  like the supposed 'marijuana.'"  (id. at B-10.)  Ledger put the card and the baggy in his pocket, proceeded to the kitchen and grabbed Stoffel's medication (which was in a baggy because hair spray had leaked on the pill bottles) from her backpack.  He asked her what they were, and she said they were Vicodin, for which she had receipts and bottles.  (Id.)

Muellenbach and Ledger then said that they had enough to get a search warrant, and Muellenbach left to get one, which took about 2 ½ hours.  While they were waiting, several other officers arrived and entered the house.  Stoffel stayed on the porch.  (Id.)  Defendant soon arrived, and he had Stoffel speak to his lawyer.  The lawyer told her that the officers should not be in the house without a warrant, and asked her if she had consented to the entry.  She said no.  Soon thereafter, Muellenbach called Ledger and said that the warrant had been issued.  The officers, except for LeCaptain (who stayed with Stoffel), then proceeded to search.  (Id. at B-11.)  Stoffel asked Ledger if she could look for her receipts and bottles, and he said, "Go ahead."  (Id. at B-12.)  Stoffel noticed that the

19

entire house had been trashed.  (Id. at B-13.)  Ledger later returned 15 Vicodin pills to Stoffel.  (Id. at B-14.)

**B.     Applicable Legal Standard**

Although the evidence defendant wants suppressed was obtained pursuant to a search warrant, the issue I must resolve is whether Stoffel consented to the initial search of her belongings in the home, pursuant to which the officers found alleged marijuana and illegal prescription medication.  For without the observations of alleged contraband made during that consent search, (1) the warrant affidavit was insufficient to establish probable cause and (2) the officers likely would not have sought a warrant.  United States v. May, 214 F.3d 900, 906 (7th Cir. 2000) (citing United States v. Markling, 7 F.3d 1309, 1315-16 (7th Cir. 1993)) (setting forth two-part test for determining whether evidence obtained pursuant to a warrant was fruit of earlier unlawful search); see also Franks v. Delaware, 438 U.S. 154, 171-72 (1978) (holding that when police include false information in warrant application, the warrant is valid only if the other information in the application, standing alone, is sufficient to establish probable cause).[8]

Warrantless entries and searches of the home are presumptively unreasonable, subject only to a few narrow exceptions.  E.g., Payton v. New York, 445 U.S. 573, 586 (1980).  However, officers need not acquire a warrant if consent is obtained.  See United

_____

[8]Defendant brought this motion under Franks, but it is probably better analyzed as an independent source case under Mays and Murray v. United States, 487 U.S. 533, 542 (1988).  As I explained in United States v. Groce, 255 F. Supp. 2d 936, 943 n.12 (E.D. Wis. 2003), a case presenting an identical issue, the alleged lie was that consent had been obtained, not that contraband was found during the allegedly unlawful search.  In any event, the analysis under Mays and Franks is basically the same.

20

States v. Dorsey, 27 F.3d 285, 290 (7th Cir. 1994). A voluntary consent "lifts" the warrant requirement. United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996).

Consent can be express or it may be implied from the circumstances. See, e.g., United States v. Wesela, 223 F.3d 656, 661 (7th Cir. 2000) (finding "implicit" consent based on conduct); United States v. Griffin, 530 F.2d 739, 742 (7th Cir. 1976) (stating that consent "may be in the form of words, gesture, or conduct"). Nevertheless, the consent, however conveyed, must be voluntary. That is, it must be freely and intelligently given rather than the product of duress or coercion. See Griffin, 530 F.2d at 742. The government bears the burden of proving that consent was voluntarily given by a preponderance of the evidence. United States v. Basinski, 226 F.3d 829, 833-34 (7th Cir. 2000). The court makes this determination by considering the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); Stribling, 94 F.3d at 324. The court may consider factors such as the age, education and intelligence of the person consenting; whether she was advised of his rights; how long she was detained prior to the consent; whether there were repeated requests for consent; any physical coercion; and whether she was in custody. United States v. Kozinski, 16 F.3d 795, 810 (7th Cir. 1994). The determination does not rest on the presence or absence of any one factor; rather, the court must consider all of the circumstances. Schneckloth, 412 U.S. at 226.

Finally, a third person with common authority over the premises or thing to be searched may provide consent. Foreman v. Richmond Police Dep't., 104 F.3d 950, 958 (7th Cir. 1997). A defendant may challenge the validity of a third-party consent to search premises in which both he and the consenting party have legitimate

21

expectations of privacy.[9] <u>United States v. Cellitti</u>, 387 F.3d 618, 621 (7th Cir. 2004). The government must demonstrate by a preponderance of the evidence that permission to search was obtained from a third party who possessed common authority over, or other sufficient relationship to, the premises or effects sought to be inspected. <u>United States v. Brown</u>, 328 F.3d 352, 356 (7th Cir. 2003). The question is not whether the third party had the actual authority to consent, but whether it was reasonable for the police to believe that she did. <u>Foreman</u>, 104 F.3d at 958 (citing <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 179 (1990)). The closer the relationship between the defendant and the consenting party, the easier it will be for the government to meet its burden. <u>United States v. Ladell</u>, 127 F.3d 622, 624 (7th Cir. 1997).

## C. Discussion

I find that Stoffel did consent. The magistrate judge found the officers' testimony that Stoffel consented to be straightforward and credible, and consistent with the other evidence of record. I agree. The officers testified consistently with one another concerning their reasons for going to Stoffel's residence, and regarding what happened once they got there. There is no indication in the record that they were biased against Stoffel or otherwise motivated to fabricate events or plant evidence to harm her. Defendant presented evidence that Muellenbach and Ledger socialized with Stoffel, but it is undisputed that this was several years before the search at issue. Both officers testified that they had no recent contacts with her. Defendant also argued that the officers were motivated to take Stoffel down because she was a

_____

[9]In the present case, the government conceded that defendant had standing to challenge the search of Stoffel's belongings inside the home. (R. 33.)

member of law enforcement gone bad.  The evidence also failed to support this contention.  Stoffel worked at the county jail at some point in the past (she was apparently on a leave at the time of the search), and the officers had some contact with her in some capacity.  However, she was not a law enforcement officer who worked on the streets, like Ledger and Muellenbach, or in any way a close associate of those officers.  Neither officer expressed any particular anger at Stoffel's alleged involvement with drugs.[10]  Finally, to the extent that any personal connection between the officers and Stoffel would have impacted their actions, it would be more reasonable to assume that they would treat her better than someone not part of the law enforcement community.  See, e.g., Asit S. Panwala, The Failure of Local and Federal Prosecutors to Curb Police Brutality, 30 FORDHAM URB. L.J. 639, 649-49 (Jan. 2003) (noting police reluctance to investigate and testify against other officers); Steven Puro, New Approaches to Ensuring the Legitimacy of Police Conduct: Federal Responsibility for Police Accountability Through Criminal Prosecution, 22 ST. LOUIS U. PUB. L. REV. 95, 103 (2003) ("Fellow officers are reluctant to vigorously pursue investigations of other officers' misconduct; many officers follow a code of silence that frustrates the investigation.").[11]

Neither am I persuaded that the officers would lie because they were angry about Stoffel's possible lawsuit against the Sheriff's Department.  It appears that

---

[10]Ledger testified that he did not like it when other police officers violated the law, and he considered it "more disappointing" if the officer was a personal friend.  (Tr. at 100.) But he expressed no particular anger or disgust about Stoffel.

[11]In any event, the testimony was that Stoffel was not the target; rather, the officers hoped that she would cooperate and identify her supplier.  (Tr. at 165.)

23

Ledger knew nothing about the suit until Stoffel mentioned it to him on the day of the search (Tr. at 141), and nothing in his testimony or the record demonstrates that either he or Muellenbach were disturbed by it.

I also find it of little consequence that Ledger made notes on a copy of Stoffel's statement, including additional notes between the first and second days of the evidentiary hearing. Ledger did not doctor the exhibit to make it more favorable to the government. He merely wrote down his disagreements with Stoffel's assertions, some of which he added after the first day of hearing. I see nothing insidious in that.

I further find that the officers' testimony did not materially contradict their prior statements. Defendant attempted to show that the officers entered the house and then asked for permission to do so. He pointed out slight variations in the phrasing of Ledger's report, his prior testimony in state court, and his testimony in the instant case.[12] However, as the magistrate judge noted, all three are consistent with a fluid exchange where Ledger asked for consent as he was walking up the porch steps and into the front door. Further, there is no evidence that Stoffel objected to the officers following her into the house. She indicated in her statement that she did not give express permission to enter, but verbal consent is not required. It was not unreasonable, even under Stoffel's version of events, for the officers to assume that they were allowed to follow her inside. This is particularly true where Stoffel gave

---

[12]For instance, in his report Ledger stated that he "followed Stoeffel up the front porch steps and into the front doot and Investigator W. Ledger asked Stoeffel if he could follow her inside." (Def. Ex. 2.) At the hearing, he said: "She started to walk up the steps to go inside, and I asked her if we could go inside with her. And she said yes, that we could go inside with her." (Tr. at 41.) He stated that this exchange occurred on the porch.

24

them no indication, once inside, that they were not welcome.  See United States v.
Walls, 225 F.3d 858, 862-63 (7th Cir. 2000) (finding valid consent where defendant
opened door and stepped back, allowing police to enter, and gave no indication that
they should leave once inside).

Stoffel's statement fails to convince me that the officers violated the Fourth
Amendment.  Like the magistrate judge, I will accept the statement for all purposes
even though it is hearsay and unsworn.  The Rules of Evidence do not apply at
suppression hearings, United States v. Severson, 49 F.3d 268, 271 n.2 (7th Cir. 1995), and
under the unusual circumstances of this case it would be unfair to deprive defendant of this
evidence.

I will also assume that if called Stoffel would have testified consistently with her
statement, that is, unfavorably to the government, and I will not (as did the magistrate
judge) give the statement any less weight because Stoffel was not subjected to cross-
examination.  However, I decline to go further and, as defendant requested, find that the
statement is conclusively true as to the issues raised in the motion.  Defendant cited no
authority for this proposition, and the typical remedy when one party prevents a witness
within its control from testifying is to instruct the fact-finder that it may infer that the
witness's testimony would have been unfavorable to that party.[13]  See, e.g., United States
v. Mahone, 537 F.2d 922, 927 (7th Cir. 1976); Federal Criminal Jury Instructions of the
Seventh Circuit § 3.24 (1999).  Defendant relied on United States v. Hammond, 598 F.2d
1008 (5th Cir. 1979), where the court found that the presentation of written statements from

_____

[13]As discussed above, there is no evidence that the government acted improperly
to keep Stoffel off the stand, or that she was in the government's particular control.

25

missing witnesses was insufficient to satisfy the defendant's due process rights. However, in that case the court found that government agents had intimidated the witnesses into refusing to testify. Nothing of the sort happened in the present case. <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858 (1982) is likewise distinguishable, for in that case the witnesses the government made unavailable (by deporting them) were in the physical custody of the government. Stoffel was not similarly situated.[14]

For several reasons, unrelated to demeanor, Stoffel's statement lacks credibility.[15] First, as the magistrate judge noted, Stoffel's contention that her prescription bottles for the 48 pills of Vicodin found in a baggy in her purse were ruined by hair spray borders on the fantastic. It seems quite unlikely that someone would carry multiple prescription bottles containing that many pills on an airplane. It is undisputed that Stoffel was only able to produce one bottle, accounting for 15 pills. Likewise, her claim that Ledger planted marijuana in her pants seems far-fetched and lacks any support in the record. No possible animus suggested by the defense would explain such lawlessness. Indeed, such a claim is contrary to defendant's contention that the officers were motivated to take her down because she was a cop gone bad.

Second, it makes little sense (under Stoffel's version) that the officers would obey when Stoffel told them they could not search the house, yet flouted her wishes when she

---

[14]The Supreme Court in that case held against the defendant because he had not shown that the deported witnesses would have provided favorable testimony. <u>Id.</u> at 873.

[15]<u>See generally</u> <u>Carradine v. Barnhart</u>, 360 F.3d 751, 753 (7th Cir. 2004) (citing Michael J. Saks, <u>Enhancing and Restraining Accuracy in Adjudication</u>, 51 L. & CONTEMP. PROBS., Autumn 1988, at 243, 263-64) (stating that "despite much lore the contrary, it appears that it is actually more difficult to assess the credibility of oral than of written testimony").

Case 2:05-cr-00200-LA   Filed 03/10/06   Page 26 of 28   Document 46

said not to search her bag.  Indeed, if the officers really acted in the manner Stoffel describes, it is hard to see why they did not just search the entire house on her purported consent, without waiting for hours, first for defendant to arrive and then to obtain a warrant.

Third, unlike the officers, Stoffel was personally interested in the outcome of the suppression hearing.  At the time she wrote the statement, she was facing state charges. She later filed a motion to suppress in her state case, presumably making the same argument made in the instant case.  Further, Stoffel had an interest in not angering defendant, with whom she was staying, and thus losing her residence.

Therefore, I find that Stoffel did consent, and that the warrant affidavit contained sufficient, truthful information.[16]  Although the parties spend little time discussing the matter, I also find that Stoffel had the apparent authority to consent.  She had lived with defendant for several months, kept her belongings at the house, and had a key to it.  (Tr. at 40.)  See United States v. Goins, No. 05-3185, 2006 U.S. App. LEXIS 3118, at *11 (7th Cir. Feb. 9, 2006) (finding apparent authority where consenting party had a key to the apartment, possessions within the apartment, and represented that she lived there on-and-off).

For all of these reasons, the motion is denied.

---

[16]Defendant made no argument that the affidavit on its face failed to support probable cause.

27

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion to dismiss count two of the indictment (R. 10) is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's motion to dismiss/compel immunity (R. 30) is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's motion to suppress (R. 11) is **DENIED**.

**FINALLY, IT IS ORDERED** that this matter is scheduled for **TELEPHONIC STATUS** on **Tuesday, March 14, 2006, at 3:30 p.m**.  The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 10th day of March, 2006.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

28